## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

ROBERT ELIE MENARD and STEVEN
KENNAN PAYNE,

        Plaintiffs,

vs.

MIAMI-DADE COUNTY and CARLOS
D. ANGULO, individually and in his
capacity as a Miami-Dade County Police
Officer,

        Defendants.

_____/

### COMPLAINT

Plaintiffs Robert Elie Menard ("Mr. Menard") and Steven Kennan Payne ("Mr. Payne") sue Defendant MIAMI-DADE COUNTY (the "County") and Defendant Carlos D. Angulo, individually and in his capacity as a Miami-Dade County Police Officer ("Officer Angulo"), and in support thereof, state the following:

### INTRODUCTION

1.      In a powerful and moving dissent, Justice Sonia Sotomayor lamented that "[f]or generations, black and brown parents have given their children 'the talk'—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them." *Utah v. Strieff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting). "Until their voices matter too, our justice system will continue to be anything but." *Id.* at 271.

2.      Robert and Steven have much in common. At the start of Summer in 2017, both Steven and Robert were in their twenties, hardworking, professionals in their field, and

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

individually respected within their communities. Robert, growing a real estate business that proudly bears his name, and Steven, a born educator—only 30 credits shy of his PhD. Both are black. Indeed, they shared many traits and qualities. Yet, neither Robert nor Steven knew of one another's existence, that is, until a single common thread—one devastating interaction—brought their lives crashing down: Officer Angulo.

3.      Two young black men. Strangers. Neither having ever been arrested before. These two strangers brought together by disgraceful acts of violence by the very same police officer, just a few months apart. Two young and vibrant lives changed forever, victims of racial profiling resulting from an implicit racial bias.

4.      These incidents are but small chapters in a tale of a nationwide epidemic approaching critical mass. These incidents also serve as a commentary on the vital need for body-worn cameras—both to deter police misconduct and to preserve the truth.

5.      This lawsuit highlights and explores the devastating impact of implicit racial bias in law enforcement. This is not about racism or deep-rooted prejudice. To the contrary, this is about a latent, sub conscious implicit racial bias so prevalent in American society and so widespread in law enforcement. This lawsuit explores many issues facing our society that need addressing: implicit racial bias; police violence; lack of accountability; the so called "blue code"; lying on reports; rubberstamping behavior; and the devasting affect on the victims of this behavior.

6.      It is only now—through the proliferation of many video recordings that have finally brought the truth to light and which have allowed the black man to be believed, that an honest and painful dialogue may be had. This is not an attack on the police. To the contrary—this is an attempt to hold the few bad apples accountable for their actions so that the vast majority of good officers can be safe and rebuild the eroded trust with the communities they are tasked with protecting and

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

serving.

7.      This is a civil rights action on behalf of Mr. Menard and Mr. Payne (collectively, "Plaintiffs") whose rights under the Fourth Amendment to the United States Constitution were violated when they were abused and mistreated by Officer Angulo. Officer Angulo approached Mr. Menard and Mr. Payne, the former while parked outside of his cousin's house and the latter while driving to his job, with his gun drawn, yelling and highly aggressive. Officer Angulo used excessive force against Mr. Menard and Mr. Payne, and falsely arrested and imprisoned Mr. Payne, causing him to be lose his teaching job as a result of the malicious prosecution he caused.

8.      Mr. Menard and Mr. Payne seek redress for the violations of their rights, privileges, and immunities as guaranteed them by the Fourth Amendment to the United States Constitution, 42 U.S.C § 1983, and the laws of the State of Florida.

## JURISDICTION AND VENUE

9.      Jurisdiction of this Court arises under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4). Supplemental jurisdiction over Plaintiffs' additional state law claims is proper pursuant to 28 U.S.C. §1367(a) because they form part of the same case or controversy.

10.      Venue is properly brought in the Southern District of Florida under 28 U.S.C. 1391(b) because it is the district in which all parties reside, and in which all of the events establishing the Plaintiffs' claims occurred.

11.      All conditions precedent to the maintenance of this action have been performed or have occurred prior to its institution.

## PARTIES

12.      Mr. Menard is 30 years old, a resident of Miami-Dade County, Florida, of African American descent, and *sui juris*.

**Rodal Law, P.A.**
5300 N.W. 33ʳᵈ Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

13.     Mr. Payne is 26 years old, a resident of Miami-Dade County, Florida, of African American descent, and *sui juris*.

14.     Defendant, Miami-Dade County, is a political subdivision of the State of Florida, organized and existing under the laws of the State of Florida. The County established and maintains the Miami-Dade Police Department, as a constituent department or agency which is responsible for, among other things, "to promote a safe and secure environment… and practice our core values of integrity, respect, service and fairness[1]" in Miami-Dade County. The County is responsible, through its officers, employees, servants, and agents, for enforcing the regulations of the County and for ensuring that its officers, employees, servants, and agents obey the laws of the State of Florida and the United States. The County assumes the risk incidental to the maintenance of a police force and the employment of law enforcement and police officers.

15.     The County has a long-standing pattern and practice and/or custom and policy of police misconduct, including racial profiling and using excessive force against citizens, specifically those of African American Descent.

16.     Officer Angulo is a natural person, a citizen of the State of Florida, residing in Miami-Dade County, Florida, over eighteen (18) years of age, and otherwise *sui juris.*

17.     At all times material, Officer Angulo was and/or is employed as a police officer of the Miami-Dade Police Department ("MDPD"). The MDPD primarily serves Miami-Dade County's unincorporated areas and has approximately 4,700 employees.

18.     At all times material hereto, Officer Angulo was an employee and a sworn law enforcement officer of MDPD and is being sued in his individual capacity. At all times material hereto, Officer Angulo was acting as an agent and employee of Miami-Dade County and was

---

[1] https://www8.miamidade.gov/global/police/home.page.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33300 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

acting under the color of state law.

19.     As set forth in more detail below, Officer Angulo, while acting within the course and scope of his employment with the MDPD and under color of law, directly violated the constitutional rights of Mr. Menard and Mr. Payne as well as violated statutory and common law duties owed to Mr. Menard and Mr. Payne.

## GENERAL ALLEGATIONS

20.     Plaintiffs provide, in their respective allegations below, the substance of certain factual allegations. Plaintiffs do not intend that their respective allegations provide, in exact detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that this section merely provide the County and Officer Angulo fair notice of the general nature and substance of the allegations.

### Implicit Racial Bias in Law Enforcement

21.     Justice Sotomayor noted that "it is no secret that people of color are disproportionate victims" of "the humiliations of … unconstitutional searches" and that these "unlawful 'stops' have severe consequences much greater than the inconvenience suggested by the name." *Strieff*, 136 S. Ct. 2056, 2069-70.

22.     How did we arrive here? How do we explain these behaviors? How do we fix it? Perhaps, the theory of implicit bias provides much needed insight into this growing problem and sheds light on the racial disparity in our justice system.

23.     The science of implicit racial bias indicates that unconscious mental processes of perception, impression, and judgment are influenced by powerful cultural stereotypes that can function to produce behavior at odds with an individual's avowed principles. *See generally* Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Calif.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33300 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

L. Rev. 945 (2006) (surveying implicit bias research). "[A] substantial and actively accumulating body of research evidence establishes that implicit race bias is pervasive and is associated with discrimination against African Americans." *Id.* at 966.[2]

24.    Due to mainstream television shows like "Cops" and many American movies, the connection between black people and crime has become deeply entrenched in the American psyche.[3] As Professor Jones points out in his book on widespread stereotypes by law enforcement, "the most ubiquitous image of the black male is a young man in saggy pants spread-eagled over the police car."[4] Thinking about crime can trigger thoughts about Blacks, which in turn activates negative stereotypes.[5] People categorize one-another "in order to make sense of experience…Racial categorization, similar to the general categorization process, is largely automatic; in other words, it occurs unintentionally and without conscious awareness."[6] Officers may even be more predisposed to automatic associations because they are constantly thinking about crime while carrying out their duties[7].

25.    Research suggests that racial bias directs police attention to Blacks regardless of whether these individuals are engaged in suspicious behavior.[8] For example, in *United States v. Mendenhall,* two Drug Enforcement Agency (DEA) officers performing a sting operation in a Detroit airport narrowed in on 22-year-old Sylvia. Mendenhall as she dis-embarked from her Los-

---

[2] The undersigned recognizes to the outstanding Amicus Brief filed by the National Association for the Advancement of Colored People ("NAACP") and The Policy Council on Law Enforcement and The Mentally Ill, in *County of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539 (2017).

[3] D. Marvin Jones, Dangerous Spaces: Beyond the Racial Profile 13 (2016).

[4] *Id.*

[5] L. Song Richardson, Arrest Efficiency and the Fourth Amendment, 95 Minn. L. Rev. 2035, 2063–64 (2011).

[6] *Id*. at 2042.

[7] *Id*. at 2064.

[8] *Id.*

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Angeles flight.[9] According to their testimony, the officers followed Ms. Mendenhall because she aroused their suspicions by appearing "very nervous," "completely scan[ing] the whole area," and not retrieving any luggage. Ms. Mendenhall's "suspicious behavior" turned out to be related an innocent explanation: the fact that she was changing planes.[10] Ms. Mendenhall was black, which neither officer mentioned when re-counting the events in their subsequent testimony.[11]

26. Once an officer zooms in on a target, automatic associations of black people as aggressive, violent, or suspicious are activated.[12] These negative stereotypes may cause an officer to behave aggressively without realizing it.[13] Further, as Professor Richardson notes in her article on the role of implicit bias in the criminal justice system, the more interactions police officers have with black people, the greater the likelihood that such encounters will trigger racial stereotypes and precipitate violence.[14] Given the pervasive negative stereotypes, it should come as no surprise that American police officers stop, arrest and kill a disproportionate number of Black people.

27. Blacks are primary targets for police stops and seizures. Between 2005 and 2008, the Center of Constitutional Rights reported that approximately 80 percent of total stops by New York officers were of black and Latinos, who comprise 25 percent and 28 percent of the city's total population, respectively.[15] During this same period, only approximately 10% of stops were of whites, who comprise 44 percent of the city's population.[16] The disproportionate contact

---

[9] *United States v. Mendenhall*, 446 U.S. 544, 547 n.1 (Stewart, J., plurality opinion) (1980).

[10] *Id*. at 564 (Powell, J., concurring). The DEA agent heard the ticket agent tell Mendenhall that "her ticket to Pittsburgh already was in order and that all she needed was a boarding pass for the flight." Id. at 573 (White, J., dissenting).

[11] See id. at 558, explaining that Mendenhall was black.

[12] *See* L. Song Richardson, Arrest Efficiency and the Fourth Amendment, 95 Minn. L. Rev. 2035, 2052–53 (2011).

[13] Id.

[14] Id.

[15] Center for Constitutional Rights. "Racial Disparity in NYPD Stop and Frisks," Executive Summary, Last modified Jan. 11, 2010, http://ccrjustice.org/sites/default/diles/assets/Report-CCR-NYPD-Stop-and-Frisk_3.pdf

[16] Id.

between police and blacks was not isolated to New York. According to a report by the Missouri Attorney General, black residents in Ferguson have also had significant contact with the police.[17] In 2013, 90 percent of searches conducted by police officers in Ferguson, were of African Americans, while 8 percent were of whites.[18] Blacks are also primary targets for police violence.

28.     Most disturbingly, Blacks are disproportionately killed by police officers. Being born black rather than white, makes a person three times more likely to be killed by police.[19] While representing only 13% of the American population, 31% of those killed by police are black.[20] A 2015 study by researcher Cody Ross found:

> There is no relationship between county-level racial bias in police shootings and crime rates (even race-specific crime rates), meaning that the racial bias observed in police shootings in this data set is not explainable as a response to local-level crime rates.[21]

The same study found that individuals who were shot by police had a higher probability of being unarmed black individuals than being *armed* white individuals.[22]

29.     Studies show that racial disparities in police seizures, brutality and killing may be the result of implicit bias by law enforcement.[23] Implicit bias can lead an officer to evaluate identical behaviors differently according to the race of the person observed.[24] Race-based biases

---

[17] *See* Mo. Att'y Gen., Racial Profiling Data (2013), http://ago.mo.gov/vehicle-stopsreport?lea=161 [https://perma.cc/A7PY-6H8N].
[18] Id.
[19] Maggie Fox, *Police Killings Hit People of Color Hardest, Study Finds*, NBC News. May 8, 2018.
[20] German Lopez, *There are Huge Racial Disparities in How US Police Use Force*, Vox, Nov. 14, 2018.
[21] Ross CT (2015) A Multi-Level Bayesian Analysis of Racial Bias in Police Shootings at the County-Level in the United States, 2011–2014. PLoS ONE 10(11): e0141854. https://doi.org/10.1371/journal.pone.0141854.
[22] Id.
[23] [See DAVID COLE, No EQUAL JUSTICE: RACE AND CLASS IN THE AMERICAN CRIMINAL JUSTICE SYSTEM, 34-41 (1999) (describing the explicit use of race in criminal profiles by police departments in Maryland, Colorado, Louisiana, and New Jersey); Kris Antonelli, State Police Deny Searches are Race-Based; ACLU Again Challenges 1-95 Stops, BALT. SUN, Nov. 16, 1996, at 18B; David Kocieniewski & Robert Hanley, Racial Profiling Was The Routine, New Jersey Finds, N.Y. TIMES, Nov. 28, 2000, at A1; Barbara Whitaker, San Diego Police Found to Stop Black and Latino Drivers Most, N.Y. TIMES, Oct. 1, 2000, at A31; Jim Yardley, Studies Find Race Disparities in Texas Traffic Stops, N.Y. TIMES, Oct. 7, 2000, at A12.]
[24] See L. Song Richardson, Arrest Efficiency and the Fourth Amendment, 95 Minn. L. Rev. 2035, 2039 (2011).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

may cause officers to notice a black person more quickly and to interpret a black person's ambiguous behaviors as suspicious and criminal.[25] For example, in one study involving video game simulation of shooting, University of Colorado researchers found that officers were quicker to shoot black suspects.[26] The study concluded the speed with which officers shoot black targets was evidence that officers perceived black men as threatening.[27]

30.     Police officers are also unlikely to be convicted and incarcerated as civilians.[28] Most judges and lawyers perceive discrimination in the criminal justice system to be isolated or episodic.[29] In discussing police brutality, Professor Susan Bandes—one of the 20 most cited law professors in criminal law and procedure—writes:

> Systematic police brutality has been masked, insulated and implicitly condoned because courts have failed to make connections among incidents...and in general persisted in defining encounters as separate from – and irrelevant to—any over-arching systematic patterns.[30]

31.     In 2013, the Report of The Sentencing Project to the United Nations Human Rights Committee, *Regarding Racial Disparities in the United States Criminal Justice System* (Sentencing Project Report) was published.[31]

32.     The Sentencing Project Report contained many alarming statistics. Here are just a few:

- African-American males are six times more likely to be incarcerated than white males and 2.5 times more likely than Hispanic males;

---

[25] Id.

[26] Joshua Correll et al., The Police  Officer's Dilemma: Using Ethnicity to Disambiguate Potentially Threatening Individuals, 83 J. PERSONALITY & SOC. PSYCHOL. 1314, 1325-26 (2002).

[27] Id.

[28] Maggie Fox, *Police Killings Hit People of Color Hardest, Study Finds*, NBC News. May 8, 2018.

[29] D. Marvin Jones, Dangerous Spaces: Beyond the Racial Profile 12 (2016).

[30] Susan Bandes, "Patterns of Injustice: Police Brutality in the Courts," Buffalo Law Review 47, no. 1275 (1999): 4.

[31] Available at http://sentencingproject.org/wp-content/uploads/2015/12/Race-and-Justice-Shadow-Report-ICCPR.pdf

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

- If current trends continue, one of every three black American males born today can expect to go to prison in his lifetime;

- In 2011, black Americans constituted 30% of persons arrested for a property offense and 38% of persons arrested for a violent offense, despite being roughly 12% of the population;

- Black youths account for 16% of all children in America yet make up 28% of juvenile arrests;

- Black drivers were three times as likely to be searched during a stop as white drivers and twice as likely as Hispanic drivers; and

- Black drivers were twice as likely to experience the use or threat of violent force at the hands of police officers than both white and Hispanic drivers.

33.     The Sentencing Project Report attributed much of this to implicit racial bias.

> A growing body of scholarship suggests that a significant portion of such disparity may be attributed to implicit racial bias, the unconscious associations humans make about racial groups. Implicit biases (commonly referred to as stereotypes) are activated when individuals must make fast decisions with imperfect information; biases—regardless of their accuracy—"fill in" missing information and allow individuals to make decisions in the limited time allowed. Extensive research has shown that in such situations the vast majority of Americans of all races implicitly associate black Americans with adjectives such as "dangerous," "aggressive," "violent," and "criminal." Since the nature of law enforcement frequently requires police officers to make snap judgments about the danger posed by suspects and the criminal nature of their activity, subconscious racial associations influence the way officers perform their jobs.

The Sentencing Project Report, at 3-4.

34.     Understanding the stakes, the U.S. Department of Justice recently announced that "it will train all of its law enforcement agents and prosecutors to recognize and address implicit bias as part of its regular training curricula." U.S. Dep't of Justice, Office of Pub. Aff., *Department of Justice Announces New Department-Wide Implicit Bias Training for Personnel* (June 27, 2016),

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

https://www.justice.gov/opa/pr/department-justice-announces-new-department-wide-implicit-bias-training-personnel.

35.     Implicit bias helps account for "evidence of a significant bias in the killing of unarmed black Americans relative to unarmed white Americans" by police officers in the United States.[32] According to one analysis, "the probability of being black, unarmed, and shot by police is about 3.49 times the probability of being white, unarmed, and shot by police on average."[33] Other analyses lend support to the conclusion that people of color are more likely to be perceived as deadly threats by officers faced with making "split-second" judgments, such as occurred in this case.[34]

36.     In conclusion, research spanning three decades provides alarming evidence that implicit biases influence law enforcement interactions with black communities, even if it occurs unintentionally. Automatic activation of negative stereotypes brings out violence or aggression in police officers, often leading to horrible consequences for black communities.[35]

## ALLEGATIONS OF MR. MENARD

37.     Mr. Menard received his bachelor's degree in criminal justice and is the proud founder of Menard Home Group, a full-service real estate brokerage firm. Mr. Menard is an Accredited Buyer's Representative (ABR®), a Military Relocation Professional (MRP), a Certified International Property Specialist (CIPS), as well as being a Sellers Representative Specialist (SRS).

---

[32] *See* Cody T. Ross, *A Multi-Level Bayesian Analysis of Racial Bias in Police Shootings at the County-Level in the United States, 2011–2014*, PLOS ONE (Nov. 2015), http://dx.doi.org/10.1371/journal.pone.0141854.
[33] *Id.*
[34] *See, e.g.*, Joshua Correll et al., *The Police Officer's Dilemma: Using Ethnicity to Disambiguate Potentially Threatening Individuals*, 83 J. Personality & Soc. Psychol. 1314, 1325 (2002) (finding that when a "target was unarmed, participants mistakenly shot him more often when he was African American than when he was White").
[35] L. Song Richardson, Arrest Efficiency and the Fourth Amendment, 95 Minn. L. Rev. 2035, 2052 (2011).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

38.     As part of his real estate business, Mr. Menard visits with potential buyers and sellers in homes throughout South Florida. On August 17, 2017, Mr. Menard finished showing a home and went to pick up his cousin, Prosper Guillaume ("Prosper") so they could attend the Miami Dolphins pre-season game scheduled to begin at 7:07 p.m.

39.     Mr. Menard stopped at a gas station and headed to Prosper's home where he saw Prosper standing outside the house, speaking with someone. As they had some time yet before the football game started, Mr. Menard parked on the swale in front of Prosper's house, and Prosper got in the passenger seat as they chatted and caught up on what was happening with each other.

40.     Mr. Menard had been driving northbound on N.W. 2nd Court, and he parked facing north.

41.     They sat and chatted for about 5-10 minutes, when at about 4:00 in the afternoon, Mr. Menard and Prosper noticed multiple police vehicles driving southbound down the street toward their direction.

42.     They didn't pay the police too much mind until the lead car pulled up just a few inches from the front of the vehicle they were sitting in, and the remaining cars quickly surrounded and boxed in their vehicle.

43.     Terrified of getting shot and in response to the actions of Officer Angulo, both Mr. Menard and Prosper immediately rolled down their windows and made their hands visible to Officer Angulo, as well as visible to the other police officers rapidly surrounding Mr. Menards's vehicle, by placing their hands up and outside of the windows.

44.     As their fear and apprehension started building, it quickly turned into sheer horror as suddenly and without any reason or provocation, Officer Angulo sprung from his police vehicle, and with his gun drawn and pointed at Mr. Menard's head, ran to the driver's side door as he

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

shouted at Mr. Menard.

45.     Upon demand, Mr. Menard gave Officer Angulo his driver's license and asked what was happening and why he was being questioned.

46.     Without answering, Officer Angulo asked Mr. Menard for his registration. When Mr. Menard asked, "for what?" Officer Angulo, immediately and without second thought, answered with force[36].

47.     Officer Angulo grabbed the car door handle with such force that that it caused damage to the door of Mr. Menard's vehicle, and proceeded to forcefully pull Mr. Menard from the vehicle and aggressively twisted Mr. Menard's left hand behind his back. At this point, Mr. Menard observed another officer approaching with a taser gun.

48.     Due to Officer Angulo's cursing, swelling anger, and aggression which was causing him to grow more and more verbally and physically aggressive with Mr. Menard, Officer Angulo's sergeant—Sergeant Lugo—intervened.

49.     Sergeant Lugo interrupted Officer Angulo by tapping his shoulder and Officer Angulo finally released his grip on Mr. Menard—but not before roughly pushing Mr. Menard against his vehicle with force.

50.     A swarm of other MDPD officers, including Yosep Fernandez, Matthew Levine, and Christopher Rodriguez, had by now surrounded Mr. Menard and Prosper.

51.     Ultimately, Mr. Menard was cited for having the tint on his vehicle windows too dark. Another Miami-Dade County officer, Christopher Rodriguez, noted that normally, he would only issue a warning but because he knew that Mr. Menard would file a complaint against the

---

[36] From the audio recording, it appears to have taken approximately 2 seconds from when Mr. Menard asked, "for what?" to the sounds of Officer Angulo yanking on the door handle and grabbing Mr. Menard.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

officers, he was issuing a citation[37]. Officer Rodriguez tried to explain away the officers' actions to Mr. Menard by saying, "you are who you hang around."

52.     As a direct result of the assault and physical violence of Officer Angulo, Mr. Menard was treated at the Aventura Hospital emergency room. Incidentally, Officer Rodriguez later referred to it as "Officer Angulo guiding [Mr. Menard] out of the vehicle." Sergeant Lugo later referred to is a "assisting" Mr. Menard.

53.     As a direct result of Officer Angulo's actions, Mr. Menard suffered extreme emotional distress and was diagnosed with post-traumatic stress disorder ("PTSD").

54.     During an internal affairs investigation into the incident, Officer Angulo lied and claimed that he was responding to a traffic stop for front window tint and that he had pulled over Mr. Menard's vehicle, when, in fact, Mr. Menard had been parked in front of his cousin's house.

55.     Officer Angulo's statement under oath—backed up by multiple officers—asserted that they had been following Mr. Menard as he headed south on N.W. 2nd Court and then pulled him over. However, this is simply fabricated. A neighbor across the street from Prosper took a picture of the scene as can be seen below.



---

[37] This allegation was later sustained by an MDPD internal affairs investigation and was recorded on body-worn cameras.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

56.     Mr. Menard's vehicle is the one vehicle facing north and the four marked and one unmarked police vehicle are all facing south. How could this possibly have happened if Mr. Menard was pulled over by Officer Angulo?

57.     Multiple sworn law officers blatantly lying under oath.

58.     The above picture is a startling reality check of what happens in broad daylight when two young black men are sitting in a vehicle with "too much tint." It is important to note that these officers were mostly part of MDPD's Crime Suppression Team, out on patrol to "stop crime." With five police vehicles occupied with a car with too much tint—who is out suppressing actual crime?

59.     Moreover, Officer Rodriguez did not turn on his body worn camera until after the violence had already occurred and could not recall how long he was on the scene while his body worn camera was not activated and in record mode. Further, Officer Rodriguez deactivated his body-worn camera, and then reactivated it in middle of his speaking with Mr. Menard and Prosper and then de-activated the camera "prior to the conclusion of the traffic stop."

60.     Officer Rodriguez was disciplined for "conduct unbecoming an employee," failure to be courteous, and failure to properly and timely activate and de-activate his body-worn camera related to the above-referenced incident.

61.     Officer Yosep Fernandez also responded to the incident and also failed to timely activate his body-worn camera, an allegation that was sustained by a disposition panel reviewing the Professional Compliance Bureau investigation. Further, Officer Fernandez deactivated his body-worn camera, and then reactivated it in middle of his speaking with Mr. Menard and Prosper and then de-activated the camera "prior to the conclusion of the traffic stop."

62.     Officer Fernandez received a written reprimand as discipline for the violations of

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Chapter 33, Part 1 of the MDPD Departmental Manual.

63.     Officer Matthew Levine was also discipled for failure to properly and timely activate and de-activate his body-worn camera related to the above-referenced incident.

64.     Multiple MDPD officers intentionally turned off their body cameras in middle of their interaction with Mr. Menard and then turned them back on, ostensibly, when they felt safe.

**ALLEGATIONS OF MR. PAYNE**

65.     Mr. Payne is dedicated to children's education and an avid athlete with a master's degree in sports administration with a focus on sports performance and is about 30 credits shy of obtaining his PhD in sports medicine.

66.     In November 2017, Mr. Payne worked at Van E. Blanton Elementary School in Liberty City, Florida, as a reading intervention specialist and then Dr. Michael M. Krop Senior High School (the "High School") as a track & field coach.

67.     On November 1, 2017, at around 2:30 p.m., Mr. Payne was driving to the High School for track & field training session. As he was driving, Mr. Payne saw one of his student/athletes on her way to the High School and he stopped to give her a ride.

68.     About three blocks from the High School, at 211st. Street and N.E. 14th. Ave., Mr. Payne saw a police car make a U-turn and pull up right behind him.

69.     As the police car continued following him, Mr. Payne became more concerned, as he had done nothing wrong and could not understand why he was being followed. Mr. Payne then pulled his vehicle over to let the police car pass. Instead of passing, Officer Angulo sprung from his police vehicle, and with his gun drawn and pointed at Mr. Payne, began shouting at Mr. Payne.

70.     Officer Angulo proceeded to run to Mr. Payne's window, pointed his service weapon at Mr. Payne, and began yelling for Mr. Payne to put his hands on the head. Then, without

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

warning, Officer Angulo pointed his gun at Mr. Payne's head and began repeatedly yelling: "*get the f\*\*k out of the car*!" Terrified of getting shot, Mr. Payne immediately obeyed by carefully exiting his vehicle and promptly laying on the ground, face down, with his hands on his head.

71.     Without even the slightest threat or provocation from Mr. Payne, Officer Angulo stood over Mr. Payne and steadily pointed his gun at Mr. Payne. Officer Angulo maintained this position, with Mr. Payne helplessly on the ground, bewildered as to why this was happening, until additional police officers arrived. Upon their arrival, Officer Angulo handcuffed Mr. Payne and put him the police car. Mr. Payne proceeded to ask why he was being arrested, to which Officer Angulo by saying he "*wasn't answering any f\*\*\*ing questions*," slammed car door in Mr. Payne's face—without reading Mr. Payne his Miranda rights—and left Mr. Payne in hot car without air circulation or ventilation.

72.     Mr. Payne was charged with reckless driving. Unbelievably, Mr. Payne was arrested and taken to the Turner Guilford Knight Correctional Center for booking.

73.     As a result, Mr. Payne lost his jobs and suffered extreme emotional distress.

## COUNT I
### Fourth Amendment-42 U.S.C. §1983
### Mr. Menard and Mr. Payne against Miami-Dade County

74.     Mr. Menard incorporates paragraphs 1-64 as though fully set forth herein.

75.     Mr. Payne incorporates paragraphs 1-36 and 65-73 as though fully set forth herein.

76.     This is an action brought against the County pursuant to the United States Constitution Amendments IV and XIV in violation of 42 U.S.C. § 1983.

77.     Prior to August 1, 2017, the County developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in the community, which caused the violation of Mr. Menard and Mr. Payne's constitutional rights.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

78.     The County maintained a policy and/or custom of inadequately and improperly investigating citizen complaints of police misconduct and officers' use of excessive force, and/or destroying evidence particularly in the form of cell phone cameras and said acts of misconduct were tolerated and not reprimanded by the County. Thus, the County inadequately discouraged constitutional violations perpetrated by its law enforcement officers and ratified improper conduct and use of excessive force.

79.     The County has a history of excessive force and Constitutional rights violations by its officers, and failed to discipline, correct the misconduct, and properly train or supervise officers; therefore, exhibiting deliberate indifference to the constitutional rights of persons in the community, specifically, Mr. Menard and Mr. Payne whose constitutional rights were violated pursuant to the United States Constitution, and they were ultimately deprived of their bodily integrity.

80.     The list of Constitutional misconduct by MDPD officers is quite extensive and goes on for pages and pages. And these are just instances available through online searches. The following incidents are just representative samples.

81.     By way of example, on or about March 15, 2019, MDPD Officer Alejandro Giraldo was caught on video using excessive force against Dyma Loving, a victim, and was later suspended.  https://www.nbcmiami.com/news/local/Dyma-Loving-Interview-Miami-Dade-arrest-Caught-on-Camera-507387661.html.

82.     On October 11, 2001, Miami-Dade Police officers shot Theodore Dukes and beat his passengers Mr. Smith and Mr. Scruggs after traffic stop in Liberty city. Mr. Dukes was hospitalized for 17 days following the attack, three of which he spent in a coma. In a lawsuit filed against the police and Miami-Dade County, the American Civil Liberties Union ("ACLU") alleged

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

that Miami-Dade police officer violated the civil rights of Mr. Dukes, Mr. Smith and Mr. Scruggs by unreasonably and excessively using force against them. ACLU Press Release. *ACLU sues Miami-Dade Police for Shooting Driver, beating passengers after Traffic Stop*, Oct. 7, 2005, https://www.aclu.org/news/aclu-sues-miami-dade-police-shooting-driver-beating-passengers-after-traffic-stop.

83.    Officer H. Rodriguez struck 26-year-old Jacksonvile Gaston in the face and grabbed him by the neck after a traffic stop in August of 2018. Although Mr. Gaston was not complying with police, witnesses said the force used by police was excessive. Roy Ramos, Cellphone video shows Miami-Dade police officer striking suspect in face, LOCAL 10 NEWS, Aug. 30, 2018, https://www.local10.com/news/florida/miami-dade/cellphone-video-shows-miami-dade-police-officer-striking-suspect-in-face.

84.    On February 14, 2019 Miami-Dade Sergeant Gustavo De Los Rios was charged with misdemeanor battery after kicking 17-year-old David Brown in the face and pushing his knee into the teen's neck while Brown was handcuffed in a shopping-plaza parking lot in northwest Miami-Dade. CBS NEWS, Video shows Miami-area police sergeant kicking handcuffed suspect, Jan. 4, 2019, https://www.cbsnews.com/news/video-shows-miami-area-police-sergeant-kicking-handcuffed-suspect-gustavo-de-los-rios-david-brown/.

85.    On May 3, 2018, Officer Mario Figueroa kicked and jumped on David Vladim Suazo, a 31-year-old Overtown resident who was not resisting as he was already handcuffed on the ground after the officer unsuccessfully attempted to taser him. Jeff Tavss, Miami police officer relieved of duty after questionable video surfaces, LOCAL 10 NEWS, May 3 2018, https://www.local10.com/news/local/miami/miami-police-officer-relieved-of-duty-after-questionable-video-surfaces.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

86.    On October 24, 2004, Randy Baker a 49-year-old, United States Army Veteran who suffered from schizophrenia at the time he was fatally shot by Miami-Police officer Saavedra. Witnesses observed as he lay on the ground and was shot in the back of the head. Baker, an African-American male, was killed by multiple gunshots intentionally fired by a Miami-Dade County Police Officer into the decedent's head and chest. Baker was unarmed and posed no serious threat or danger to the Miami-Dade County Police Officer, or to any other person. Ihosvani Rodriguez, Neighbors Angry at Police After Mentally Ill Man is Slain, THE SUN SENTINEL, October 26, 2004,  http://articles.sun-sentinel.com/2004-10-  26/news/0410250496_1_police-officers-miami-dade-police-threepolice.

87.    On April 23, 2010, MDPD officers committed excessive force against Michael and Vanessa Robertson and falsely arrested them. Miami-Dade Circuit Court Case No. 13-024923 CA 24.

88.    On October 26, 2007, Gracia Beaugris, a Haitian-immigrant, was on his way home from a laundromat with friends when Officer Christopher Villano stopped and then frisked them. When he questioned the officer about why they were being stopped, Villano shot Beaugris in the arm. After Beaugris fell to the ground, the Miami Dade officer fired two more shots into him while on the ground. Beaugris died at the scene. He was only 19 years old and unarmed.

89.    On July 13, 2012, Miami-Dade County Police shot 48-year-old Leon Fitzgerald Harrigan. The officer shot Mr. Harrigan while he was unarmed and sitting in a stationary vehicle. Following the shooting, Mr. Harrigan suffers from severe muscle and tissue damage. He later filed a pro-se lawsuit against the Miami-Dade Police department. Case No. 1:12-cv-22993-Martinez/White (S.D. Fla. 2012).

90.    On, January 4, 2013. Xavier Johnson was shot and killed by Miami-Dade County

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Police Officers when they fired multiple rounds into a vehicle after a high-speed chase because they allegedly suspected the car's occupants of shoplifting of makeup from a CVS store. Johnson was brought to a local hospital and died a few hours later at Kendall Regional Medical Center. Case No. 1:13-cv24450-LENARD (S.D. Fla. 2013).

91.     On April 27, 2008, 31-year-old Joseph Lumpkin was fatally shot by a Miami-Dade County Police Officer after a chase ensued in which the officer suspected Lumpkin of being a shoplifter at the Southland Mall in Goulds, a mall located about 45 minutes south of Miami. The officer reported they grappled for the gun, which then discharged. Lumpkin died at the scene. Florida    in    Brief,    the    St.    Augustine    Record,    Apr.    29,    2008, http://staugustine.com/stories/042908/state_txt01_013.shtml#.VwhGKIrJZg.

92.     As a result of the above-mentioned polices and customs, the County's officers believed that their inappropriate actions would not be subject to proper monitoring by supervisors, and that misconduct would not be subject to investigation nor sanction but would instead be tolerated by the County.

93.     The above facts denote a deliberate indifference on the part of the County policy makers and custom enforcers, to uphold the constitutional rights of citizens of the County, including Mr. Menard and Mr. Payne, in particular, citizens' right to be free from excessive force, which actually and proximately caused violations of Mr. Menard and Mr. Payne's constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

94.     Mr. Menard and Mr. Payne have ongoing and continuous permanent damages and injuries and as such are entitled to recovery.

95.     As a direct and proximate result of the unlawful battery, Mr. Menard and Mr. Payne have suffered pain and suffering, mental anguish, emotional distress, and loss of capacity for the

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

enjoyment of life.

**WHEREFORE**, Plaintiffs ROBERT ELIE MENARD and STEVEN KENNAN PAYNE, seek entry of final judgment against Defendant Miami-Dade County for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

**COUNT II**
**Fourth Amendment-42 U.S.C. §1983**
**Mr. Menard against Defendant, Officer Angulo**

96.     Mr. Menard incorporates paragraphs 1-64 as though fully set forth herein.

97.     At all times material, Mr. Menard had a constitutionally protected right to be free from unreasonable searches and seizures or from being subjected to a seizure or arrest without probable cause and maintained the right to be free from unlawful assault, protected rights under the Fourth and Fourteenth Amendments of the United States Constitution.

98.     On August 17, 2017, Officer Angulo unlawfully detained and deprived Mr. Menard of his liberty, against his will and without legal authority to do so.

99.     At no time did Officer Angulo have any reasonable or articulable suspicion or probable cause which would support a constitutional seizure or arrest of Mr. Menard.

100.     On August 17, 2017, notwithstanding having no reasonable or articulable suspicion, and without probable cause, Officer Angulo caused Mr. Menard to be detained, arrested and searched, all in violation of clearly established law.

101.     At all times material, any reasonably competent officer having a reasonable degree of training and expertise should have known that there was no constitutional or legally justifiable basis to arrest Mr. Menard.

102.     At all material times, it was a clearly established violation of Mr. Menard's

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

constitutional right to be free from unreasonable searches and seizures to be subjected to a search and arrest, when no reasonable or articulable suspicion or probable cause of any criminal activity existed to seize or arrest Mr. Menard.

103.    At all times material, Officer Angulo, in arresting Mr. Menard concealed, suppressed, omitted, and mischaracterized material facts, information, statements, or otherwise evidence, of which Officer Angulo had knowledge, in violation of Mr. Menard's rights of due process.

104.    At all times material, Officer Angulo knowingly, or with reckless disregard for the truth, prepared, caused to be prepared, or participated in the preparation of an intentionally false and misleading report to support his (Officer Angulo's) unconstitutional arrest and search of Mr. Menard.

105.    At all material times, any reasonably competent law enforcement officer with adequate training should have known that the actions being taken in regard to the arrest and search of Mr. Menard were improper, unconstitutional, and likely to result in the violation of the constitutional rights of Mr. Menard.

106.    On August 17, 2017, Officer Angulo intended to cause, and did cause, offensive contact and unconsented touching of the body of Mr. Menard, while acting under the color of law.

107.    At all material times, it would have been readily apparent to a reasonably competent and trained police officer, having due regard for Mr. Menard's constitutional rights, that the use of physical force employed against Mr. Menard, without Mr. Menard offering any physical threat or resistance, was unjustified and was in violation of clearly established law and Mr. Menard's constitutional rights.

108.    The actions of Officer Angulo violated Mr. Menard's clearly established Fourth

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Amendment rights, and a reasonable police officer would have understood that what Officer Angulo did violated those rights.

109.    As a direct and proximate result of the false imprisonment, assault, and battery, Officer Angulo has, including but not limited to, pain and suffering, mental anguish, emotional distress, and loss of capacity for the enjoyment of life.

**WHEREFORE**, Plaintiff ROBERT ELIE MENARD, seeks entry of final judgment against Defendant CARLOS D. ANGULO for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

### COUNT III
### Fourth Amendment-42 U.S.C. §1983
### Mr. Payne against Defendant, Officer Angulo

110.    Mr. Payne incorporates paragraphs 1-36 and 65-73 as though fully set forth herein.

111.    At all times material, Mr. Payne had a constitutionally protected right to be free from unreasonable searches and seizures or from being subjected to a seizure or arrest without probable cause and maintained the right to be free from unlawful assault, protected rights under the Fourth and Fourteenth Amendments of the United States Constitution.

112.    On November 1, 2017, Officer Angulo unlawfully detained and deprived Mr. Payne of his liberty, against his will and without legal authority to do so.

113.    At no time did Officer Angulo have any reasonable or articulable suspicion or probable cause which would support a constitutional seizure or arrest of Mr. Payne.

114.    On November 1, 2017, notwithstanding having no reasonable or articulable suspicion, and without probable cause, Officer Angulo caused Mr. Payne to be detained, arrested and searched, all in violation of clearly established law.

115.    At all times material, any reasonably competent officer having a reasonable degree

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

of training and expertise should have known that there was no constitutional or legally justifiable basis to arrest Mr. Payne.

116.    At all material times, it was a clearly established violation of Mr. Payne's constitutional right to be free from unreasonable searches and seizures to be subjected to a search and arrest, when no reasonable or articulable suspicion or probable cause of any criminal activity existed to seize or arrest Mr. Payne.

117.    At all times material, Officer Angulo, in arresting Mr. Payne concealed, suppressed, omitted, and mischaracterized material facts, information, statements, or otherwise evidence, of which Officer Angulo had knowledge, in violation of Mr. Payne's rights of due process.

118.    At all times material, Officer Angulo knowingly, or with reckless disregard for the truth, prepared, caused to be prepared, or participated in the preparation of an intentionally false and misleading report to support his (Officer Angulo's) unconstitutional arrest and search of Mr. Payne.

119.    At all material times, any reasonably competent law enforcement officer with adequate training should have known that the actions being taken in regard to the arrest and search of Mr. Payne were improper, unconstitutional, and likely to result in the violation of the constitutional rights of Mr. Payne.

120.    On November 1, 2017, Officer Angulo intended to cause, and did cause, offensive contact and unconsented touching of the body of Mr. Payne, while acting under the color of law.

121.    At all material times, it would have been readily apparent to a reasonably competent and trained police officer, having due regard for Mr. Payne's constitutional rights, that the use of physical force employed against Mr. Payne, without Mr. Payne offering any physical threat or resistance, was unjustified and was in violation of clearly established law and Mr. Payne's

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

constitutional rights.

122.     The actions of Officer Angulo violated Mr. Payne's clearly established Fourth Amendment rights, and a reasonable police officer would have understood that what Officer Angulo did violated those rights.

123.     As a direct and proximate result of the false imprisonment, assault, and battery, Officer Angulo has, including but not limited to, pain and suffering, mental anguish, emotional distress, and loss of capacity for the enjoyment of life.

**WHEREFORE**, Plaintiff STEVEN KENNAN PAYNE, seeks entry of final judgment against Defendant CARLOS D. ANGULO for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

**COUNT IV**
***False Imprisonment***
***Mr. Menard against Officer Angulo***

124.     Mr. Menard incorporates paragraphs 1-64 as though fully set forth herein.

125.     This is an action, under the common law of the State of Florida, for false arrest. Such claims arise from a common nucleus of operative facts as the violations of 42 U.S.C. § 1983, as set forth above.

126.     On or about August 17, 2017, Officer Angulo, acting in the course and scope of his employment as a police officer for The County, and with malice, bad faith or wanton or willful disregard for the safety of Mr. Menard's well-being, planted or otherwise fabricated evidence on Mr. Menard causing him (Mr. Menard) to be falsely arrested and detained.

127.     Officer Angulo caused Mr. Menard to be arrested, detained, and deprived Mr. Menard of his liberty, against his will and without legal authority to do so, despite his desires to leave. The actions of Officer Angulo, of which caused Mr. Menard to be arrested, were

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

unreasonable and unwarranted under the circumstances, and were against Mr. Menard's will, and without legal authority.

128.    As a direct and proximate result of the false imprisonment, Mr. Menard has suffered bodily injury, pain and suffering, mental anguish, loss of capacity for enjoyment of life, lost wages, and loss of ability to earn money. These injuries and losses are permanent and continuing, and Mr. Menard will suffer such losses in the future.

129.    Mr. Menard has complied with all conditions precedent pursuant to Fla. Stat. 768.28 prior to filing this action.

**WHEREFORE**, Plaintiff ROBERT ELIE MENARD, seeks entry of final judgment against Defendant CARLOS D. ANGULO for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

**COUNT V**
***Battery***
***Mr. Menard against Officer Angulo***

130.    Mr. Menard incorporates paragraphs 1-64 as though fully set forth herein.

131.    This is an action, under the common law of the State of Florida, for battery.  Such claims arise from a common nucleus of operative facts as the violations of 42 U.S.C. § 1983, as set forth above.

132.    The conduct of Officer Angulo, on August 17, 2017, in illegally arresting Mr. Menard, and employing excessive force to do so, was intentional and intended to cause a harmful or offensive contact with the person of Mr. Menard.

133.    The conduct of Officer Angulo was committed within the course and scope of his employment with The County.

134.    As a direct and proximate result of the battery alleged above, Mr. Menard suffered

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

bodily injury and resulted in pain and suffering, mental anguish, loss of capacity of enjoyment of life, lost wages and loss of ability to earn money. These injuries and losses are permanent and continuing, and Mr. Menard will suffer such losses in the future.

**WHEREFORE**, Plaintiff ROBERT ELIE MENARD, seeks entry of final judgment against Defendant CARLOS D. ANGULO for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

**COUNT VI**
***False Imprisonment***
***Mr. Payne against Defendant, Officer Angulo***

135.     Mr. Payne incorporates paragraphs 1-36 and 65-73 as though fully set forth herein.

136.     This is an action, under the common law of the State of Florida, for false arrest. Such claims arise from a common nucleus of operative facts as the violations of 42 U.S.C. § 1983, as set forth above.

137.     On or about November 1, 2017, Officer Angulo, acting in the course and scope of his employment as a police officer for the County, and with malice, bad faith or wanton or willful disregard for the safety of Mr. Payne's well-being, planted or otherwise fabricated evidence on Mr. Payne causing him to be falsely arrested and detained.

138.     Officer Angulo caused Mr. Payne to be arrested, detained, and deprived Mr. Payne of his liberty, against his will and without legal authority to do so, despite his desires to leave. The actions of Officer Angulo, of which caused Mr. Payne to be arrested, were unreasonable and unwarranted under the circumstances, and were against Mr. Payne's will, and without legal authority.

139.     As a direct and proximate result of the false imprisonment, Mr. Payne has suffered bodily injury, pain and suffering, mental anguish, loss of capacity for enjoyment of life, lost wages,

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

and loss of ability to earn money. These injuries and losses are permanent and continuing, and Mr. Payne will suffer such losses in the future.

140.    Mr. Payne has complied with all conditions precedent pursuant to Fla. Stat. 768.28[38] prior to filing this action.

**WHEREFORE**, Plaintiff STEVEN KENNAN PAYNE, seeks entry of final judgment against Defendant CARLOS D. ANGULO for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

**COUNT VII**
*<u>Battery</u>*
**Mr. Payne against Defendant, Officer Angulo**

141.    Mr. Payne incorporates paragraphs 1-36 and 65-73 as though fully set forth herein.

142.    This is an action, under the common law of the State of Florida, for battery.  Such claims arise from a common nucleus of operative facts as the violations of 42 U.S.C. § 1983, as set forth above.

143.    The conduct of Officer Angulo, on November 1, 2017, in illegally arresting Mr. Payne, and employing excessive force to do so, was intentional and intended to cause a harmful or offensive contact with the person of Mr. Payne.

144.    The conduct of Officer Angulo was committed within the course and scope of his employment with The County.

145.    As a direct and proximate result of the battery alleged above, Mr. Payne suffered bodily injury and resulted in pain and suffering, mental anguish, loss of capacity of enjoyment of

---

[38] The "argument that bad faith is inherent in Plaintiff's claim against the County for false arrest and imprisonment—and that the claim must therefore be dismissed under § 768.28(9)—is without merit. *Vega v. Enamorado,* 2007 WL 9702731, at fn. 9 (S.D. Fla. 2007) (Ungaro, J.)

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

life, lost wages and loss of ability to earn money. These injuries and losses are permanent and continuing, and Mr. Payne will suffer such losses in the future.

**WHEREFORE**, Plaintiff STEVEN KENNAN PAYNE, seeks entry of final judgment against Defendant CARLOS D. ANGULO for compensatory and punitive damages, as well as costs, attorney fees, and such other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, respectfully, demand a trial by jury of all issues so triable.

Respectfully Submitted,

/s/ Yechezkel Rodal
Yechezkel Rodal, Esq.
Florida Bar No.  91210
E-mail:chezky@rodallaw.com
RODAL LAW, P.A.
5300 N.W. 33rd Ave., Suite 219
Fort Lauderdale, Florida 33309
Phone: (954) 367-5308
Fax:    (954) 900-1208

*Counsel for Plaintiffs*

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com